IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA                                                                    PLAINTIFF

V.                                                                   CAUSE NO. 3:22-CR-108-CWR-ASH

DARRIUS CHARLES MCELROY                                                                    DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Darrius Charles McElroy's *Motion to Suppress Evidence*. The Court has considered the testimony and other evidence presented at the suppression hearing and heard arguments of counsel.[1] For the reasons stated below, Mr. McElroy's *Motion* is granted.

**I. FACTS**

This story begins a year before Jackson Police Department ("JPD") detectives pulled over Darrius McElroy resulting in the instant felon-in-possession charge.

**A. The 2020 Incident**

On June 15, 2020, JPD Sergeant Michael Martin saw a white Toyota Avalon parked on the wrong side of the road, facing on-coming traffic. The car was on the 2800 block of Newport Street. It was occupied by two persons. Sergeant Martin called for assistance. Detective Tarik Williams responded.

Detective Williams pulled in front of the Avalon. Sergeant Martin turned on his blue lights and pulled past Detective Williams' vehicle. At that point, the Avalon's passenger door opened, and the passenger jumped out. The driver put the car in reverse and almost hit the passenger. The

---

[1] This order utilizes a rough draft of the June 11, 2024 hearing transcript. Due to the urgency at which the Court requested the transcript, it has not yet been certified. See *United States v. Lopez*, 817 F. Supp. 2d 918 at n.3 (S.D. Miss. 2011) (citing to a rough draft of the hearing transcript within the order of the Court.)

passenger door was still open and "slammed into the passenger side of Sergeant Martin's vehicle." Docket No. 20 at 28. The Avalon fled.

Sergeant Martin and Detective Williams pursued the Avalon as the driver "began to throw items out of the vehicle." *Id*. Sergeant Martin stopped to recover the items while Detective Williams continued his pursuit. Eventually the driver jumped out and ran away. Detective Williams "began to process the scene." *Id*. at 29. He recovered narcotics, a firearm, and "documents bearing the name Darrius McElroy." *Id*. The officers then presented affidavits to the Municipal Court Judge, who issued arrest warrants for Mr. McElroy. Reports detailing the chase were prepared by Sergeant Martin and Detective Williams. The report prepared by Detective Williams gives a detailed, twelve paragraph turn-by-turn account, naming each street the vehicles traveled during the chase. *See id*. at 28-31.

The officers had made a mistake. Mr. McElroy was not in the vehicle that day.[2] James and LaKendrick Harris were the occupants, not Mr. McElroy. Docket No. 40-1. That fact did not matter. Shockingly, Mr. McElroy was charged with being a felon in possession of a firearm and possession of marijuana while possessing a firearm. Docket No. 40-2.

The tie between James and LaKendrick Harris and Mr. McElroy, according to Detective Williams' testimony in this case, is that all three are members of the gang he was tasked with investigating. It is called the "Butthead Gang." According to the Detective, Mr. McElroy was "supposedly or allegedly . . . was the leader of the Butthead Gang."[3] Hr'g Tr. at 30.

---

[2] In his testimony Detective Williams claimed that his sergeant believed the person to be Mr. McElroy, while he did not. Hr'g Tr. at 21. Detective Williams said that Mr. McElroy was charged, although he believed the charges were ultimately dismissed. *Id*. at 24.
[3] It was revealed at the hearing that Mr. McElroy had an older brother, now deceased, who went by the nickname "Butthead." Hr'g Tr. at 16-17.

2

Detective Williams was in a JPD gang unit that had been investigating the Butthead Gang for months. He had a PowerPoint slideshow showing individuals "that were possibly a part of this Butthead Gang." *Id.* at 29-30. It included a photo of Mr. McElroy. *Id*.

That brings us to the present case.

### B. The 2021 Incident

On July 31, 2021, just over a year after James Harris hit a JPD vehicle with the Avalon passenger door, Detective Williams claims to have spotted Mr. McElroy driving the same white Avalon. He says McElroy was not wearing his seatbelt.

That day, Detective Williams and Detective Warren Hull were parked at the gas station at the intersection of Medgar Evers Boulevard and Ridgeway Street.[4] From their location, Detective Williams reported that he observed the driver of the white Avalon without a seatbelt on "as the vehicle traveled north on Medgar Evers Boulevard." Docket No. 35-1 at 5.

The detectives pursued the vehicle and turned their blue lights on. Detective Williams says the Avalon did not stop and continued to drive north on Medgar Evers Boulevard, making a right on Sunset Drive and then a right onto Newport Street. Detective Williams says the Avalon pulled into the driveway of 2857 Newport Street—on the same block as the 2020 incident—and the driver exited the Avalon. At that point, Detective Williams says he recognized Mr. McElroy from his ongoing investigation into the Butthead Gang. He hollered Mr. McElroy's entire name before giving chase.

The detective says Mr. McElroy ran into the residence through a backdoor. Detective Williams tried to enter but could not; someone inside had blocked his entry. At that point Detective

---

[4] Detective Williams testified that part of his job as a narcotics detective is to "sit at major intersections just monitoring traffic." Hr'g Tr. at 11. At the hearing he was asked if narcotics detectives enforce traffic violations because they often produce narcotics evidence. He responded: "Yes, sir." *Id*. at 12.

3

Williams went back to the Avalon and smelled marijuana coming from the vehicle. The vehicle was locked.[5]

Detective Williams called for backup and spoke to the homeowner outside. He obtained consent to enter the residence. Once backup arrived, the police "conducted a basic sweep of the residence." *Id*. They did not find Mr. McElroy. Detective Williams returned to JPD headquarters and prepared a search warrant application for the Avalon based on the smell of marijuana, the car's abandonment, and the occupant's flight. Jackson Municipal Judge June Hardwick signed off on the search warrant. Docket No. 40-2.

With the warrant in hand, police opened the car door. Detective Williams and his colleagues recovered from it 448 grams of marijuana, 12 grams of cocaine, a Ruger pistol, $1,003 in cash, sandwich bags, and a digital scale. Detective Williams contacted the Mississippi Department of Corrections and verified that Mr. McElroy had prior felony convictions. He processed the evidence and prepared his reports that same day. The reports documented features of the vehicle, including that the "passenger door is a different color." Docket No. 35-1 at 2.

Detective Williams then sought and secured warrants for Mr. McElroy's arrest. Docket No. 40-2. The felony charges were possession of marijuana with a firearm, possession of cocaine, and being a convicted felon with a firearm. The detective also secured a misdemeanor warrant for resisting arrest and issued citations for no seatbelt and failure to yield to blue lights. The federal government would later get involved by charging Mr. McElroy more than a year later with being a felon in possession of a firearm, the sole charge in this Court. Docket No. 4.

---

[5] There was no testimony at the hearing detailing whether the car windows were rolled up or down after the car was abandoned. It is reasonable to assume the car windows were up completely or almost completely up because the police needed assistance to open the vehicle. They had "to contact JFD to help open the door to the Toyota Avalon." Docket No. 35-1 at 6.

Mr. McElroy now argues that Detective Williams' account is not true. He was not violating any traffic laws when he was pulled over, he asserts, and argues that the detectives conducted an illegal pretextual stop. Because the detectives "lacked the requisite probable cause to initiate a traffic stop of the driver of the Toyota Avalon for any crime," he contends, the "evidence [that] was obtained as a direct result of the illegal stop and detention, . . . is, thus, 'fruit of the poisonous tree.'" Docket No. 34 at 2. Mr. McElroy seeks to have all evidence recovered from the vehicle suppressed.

The Court held an evidentiary hearing on June 11, 2024. Detective Williams was the lone witness to testify. Defense counsel cross-examined him about his ability to see the alleged seatbelt violation. Detective Williams claimed that he had a clear view of the seatbelt violation because the car turned onto Medgar Evers Boulevard from Coleman Avenue—a street directly in his line of sight. Mr. McElroy challenged the credibility of Detective Williams' testimony. Mr. McElroy called no witnesses. Of course, he did not have to.

The Court deferred ruling at the hearing. This Order followed.

## II.  LEGAL STANDARD

Generally, "on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (citation omitted). However, warrantless searches are presumptively unreasonable under the Fourth Amendment. *United States v. Wallen*, 388 F.3d 161, 164 (5th Cir. 2004) (citation omitted). "When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

### III.  DISCUSSION

### A.  Constitutionality of the Stop

*Terry v. Ohio* provides a two-part inquiry to determine the legality of investigatory stops. 392 U.S. 1, 19–20 (1968). The Court must ask whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citation omitted). For the first prong, "[o]nly when the police have a reasonable basis to suspect criminal activity can they justifiably conduct an investigative stop." *United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007). As to the second prong, a "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (citation omitted).

While "[a]n officer's reasonable suspicion that there is a traffic violation – including failure to wear seatbelts – is an appropriate basis for stopping a vehicle," *United States v. Thomas*, No. 5:20-CR-10-DCB-FKB, 2021 WL 5173618, at *2 (S.D. Miss. Nov. 5, 2021) (cleaned up), the suspicion has to, in fact, be reasonable. Courts tasked with analyzing the reasonable suspicion of a stop "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In an evidentiary hearing, the Court sits as a finder of fact and must resolve all disputed issues. *United States v. Willis,* 525 F.2d 657, 659 (5th Cir. 1976); Fed. R. Evid. 104 cmt. ("To the extent that [admissibility] inquiries are factual, the judge acts as a trier of fact."). The Court is required to determine the credibility of the witnesses in order to fulfill its duty to resolve the

6

disputed questions of fact. *Id.*; *see also United States v. Jones*, 187 F. Supp. 3d 714, 723 (M.D. La. 2016) ("The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts. At a suppression hearing, it is well within the trial court's discretion to weigh the evidence and make credibility determinations regarding conflicting testimony.") (internal citations and quotes omitted).

The first prong of the *Terry* inquiry is the issue today. The Government argues that Detective Williams was justified in stopping the Avalon for a seatbelt violation. Mr. McElroy responds that Detective Williams did not in fact observe a seatbelt violation, but rather conducted a pretextual stop of Mr. McElroy—a person whom Detective Williams was already investigating. The question is whether Detective Williams' testimony regarding the seatbelt violation is credible.

Relevant to the credibility inquiry are the two key pieces of evidence in conflict: (1) the JPD Field Case Report written by Detective Williams on July 31, 2021, Docket No. 35-1, and (2) the Detective's testimony at the suppression hearing nearly three years later.

Detective Williams' Field Case Report states that he and Detective Hull were stationary in his vehicle at the intersection of Medgar Evers Boulevard and Ridgeway Street. *Id.* at 5. The narrative explained that "at this intersection, I observed that the driver of a white in color Toyota Avalon was not wearing his seatbelt as the vehicle traveled north on Medgar Evers Boulevard." *Id.* At the hearing, Detective Williams likewise testified that he was in his vehicle at the gas station, observing traffic at the intersection.[6] Hr'g Tr. at 4-5. Detective Williams said he was on the east side of Medgar Evers with his vehicle facing west. *Id.* at 5. He testified that he could see traffic coming from all directions. *Id.*

---

[6] He gave the address of 3710 Medgar Evers Blvd. for the gas station. Hr'g Tr. at 44-45. This is the address for an Express Lane gas station. *See* https://maps.app.goo.gl/ndCPhFjPXbETyKYV8.

Yet almost three years later, at the hearing, Detective Williams introduced a new detail that was absent from the Field Case Report narrative. This time, he claimed that Mr. McElroy's vehicle turned onto Medgar Evers *from* Coleman Avenue. It was then, as the Avalon was "making the left turn, you could see the front of the vehicle." *Id.* at 6. He continued, "I saw a white in color vehicle coming to the intersection of Coleman Avenue and Medgar Evers Boulevard. As the vehicle made a left turn crossing my path, I could see through the windshield that the driver was not wearing a seat belt." *Id.* at 5.

To make the competing narratives easier to visualize, the Court includes a map with two accompanying markups below.



The red line shows the vehicle's path of travel as described in the Field Case Report. The Court understands this narrative to suggest the vehicle already was on Medgar Evers travelling northbound, which in truth is a northwesterly direction.

8

The blue line shows the path of travel Detective Williams described at the hearing. This narrative claims that the Avalon emerged from Coleman Avenue and made a left turn onto Medgar Evers.

The factual dispute is simple: was the Avalon already on Medgar Evers as the Field Case Report narrative suggests, or did it make the left turn from Coleman as Detective Williams testified to years later?

Detective Williams testified that from his vehicle, he had a clear line of sight through his front windshield, through the Avalon's front windshield, and into the Avalon to see Mr. McElroy without a seatbelt. "When the light changed, it made the left turn and crossed my field of view. That way I could have a clear view of the front windshield." Hr'g Tr. at 46. He added that the driver had on a white shirt which made it easier to see that there was no seatbelt on. *Id.* at 40. At that corner, the only way Detective Williams could have seen a seatbelt violation inside the Avalon is if the vehicle made the left turn from Coleman Avenue.

Yet this key fact about the left turn from Coleman Avenue is absent from every contemporaneous document. It is missing from the Field Case Report narrative and missing from the Underlying Facts and Circumstances affidavit he presented to secure the search warrant. ("UFC").[7] Docket Nos. 40-3 and 40-4.

This lack of detail is peculiar. Detective Williams' reporting was very detailed. He named seven different streets in his Field Case Report that day: Medgar Evers Boulevard, Ridgeway Street, Rutledge Avenue, Liberty Street, Sunset Drive, O'Bannon Drive, and Newport Street. Docket No. 35-1. Yet nothing about a turn from Coleman Avenue. Even Detective Williams'

---

[7] The UFC appears to be an abridged version and includes fewer facts than the Field Case Report. *See* Docket No. 40-4. The UFC does not indicate any street names or path of travel until its fourth sentence, where it says "[t]he vehicle made a right turn onto Sunset Drive from Medgar Evers Boulevard." *Id*. In other words, the UFC includes street names and turns that occurred only toward the end of the pursuit.

9

narrative from the 2020 incident involving the Avalon is similarly very detailed with a turn-by-turn account of the chase. *See* Docket No. 20 at 28-31. Yet here, the most critical detail is missing from one of his normally very detailed reports.

The first and only time that the turn from Coleman Avenue was mentioned was at the evidentiary hearing before this Court on June 11, 2024. It also is the only fact that ensures the detective had a clear view into the vehicle. It is reasonable to assume this critical detail, if it occurred, would have been included in the documents Detective Williams wrote that day, especially the UFC, but it is absent. Detective Williams admitted that he never told anybody about the left turn from Coleman until the hearing, except for telling the Government's attorneys in preparation for the hearing. Hr'g Tr. at 56.

As Chief Judge Jordan wrote in another suppression matter, when an incident "happened over two years ago, . . . memories can fade." *United States v. Maberry*, 193 F. Supp. 3d 724, 727 (S.D. Miss. 2016). One would naturally expect the details written the day of the incident to be the most accurate, *i.e.*, the "best evidence" of the truth, rather than information recalled years later after hearing preparation. The absence of contemporaneous evidence casts doubt on the notion that Detective Williams has remembered the situation accurately. "It seems all too convenient that Officer [Williams] would remember" this critical detail almost three years later at the suppression hearing. *Jones*, 187 F. Supp. 3d at 725.

Video footage would have been helpful to determine whether a "particularized and objective basis" existed to stop Mr. McElroy. At the hearing, though, it was revealed that no body camera or dash camera footage supports Detective Williams' testimony.

Detective Williams claims that in 2021, JPD vehicles did not have dash cameras. Hr'g Tr. at 31. Detective Williams did, however, have a body camera on his chest. Yet he decided not to preserve the footage.

Detective Williams testified that he turned his body camera on after he turned his blue lights on. *Id.* at 32. No footage remains because Detective Williams selected the "misdemeanor" recording option. *Id.* at 31-38. Detective Williams explained that body camera footage is only preserved for a few months for misdemeanors.[8] *Id.* at 34. He selected "misdemeanor" because the seat belt violation and the smell of marijuana from the car were only misdemeanors. *Id.* He adds that when he left the scene to obtain a search warrant, he kept the recording as a misdemeanor. *Id.* Thus, no footage from that day exists. *Id.*

This testimony is not persuasive. The marijuana could obviously support a felony charge. Detective Williams recognized Darrius McElroy as soon as he exited the car. He was investigating him and knew his criminal history. He had a picture of him from a prior arrest in a PowerPoint. And the detective knew later that day that Mr. McElroy was a convicted felon who possessed narcotics and a firearm. That is a felony, and the narcotics detective, of course, knew that. Yet, Detective Williams never downloaded the footage or asked someone else to preserve it in the months it existed before its deletion. *Id.* at 38. And his claim that the footage would have been unhelpful is not credible. In this as in every other matter, the party accused of erring is not in the best position to determine the value of evidence.

---

[8] Detective Williams did not specify the exact number of months that the body camera footage would remain in the JPD cloud for a misdemeanor rather he said, "it's only for, like, a few months, some months or so." Hr'g Tr. at 35. Footage for a felony interaction, however, "lasts for some years," he thought. *Id.* at 32.

11

At the hearing, Detective Williams admitted that he knew after leaving Newport Street that evening that the case may end up in federal court or in circuit court as a felony offense. *Id.* at 36. He nevertheless did not attempt to preserve any video evidence.

The Court also observes that even though the incident occurred on July 31, 2021, felony charges were not filed until October 5, 2022, long after the time when the video account of a misdemeanor would have been deleted.

We will never know what the footage captured and are left only with the writings and years-old recollections of Detective Williams.

We return to the legal standard. It says this Court's "role at a suppression hearing is to determine the credibility of witnesses and find the facts." *Jones*, 187 F. Supp. 3d at 723 (internal citations and quotes omitted). And simply put, this Court does not find Detective Williams' recent recollections credible.

The Field Case Report Narrative and the UFC indicate that the Avalon was moving northbound on Medgar Evers. They do not mention Coleman Avenue once. Based on that trajectory, from the Detective's vantage point at the gas station, he would not have been able to see inside and across the Avalon to observe the supposed seat belt violation. Instead, he saw the Avalon's damaged passenger door, which was already known to him from the previous incident and stood out because it was "a different color" than the rest of the vehicle. Docket No. 35-1 at 2. Detective Williams confirmed as much, testifying that "[o]nce I looked at the door, it was like, that's the vehicle we had the pursuit with the year prior." Hr'g Tr. at 50. No video evidence supports the Detective's recent recollection.

Given all of these factors, the Court is not persuaded that Detective Williams had reasonable suspicion to stop Mr. McElroy's vehicle.

In *United States v. Maberry*, Chief Judge Jordan acknowledged a conflict between the officer's report, the UFC, and the officer's testimony at the suppression hearing. He gave most weight to the UFC because it "was obviously prepared at the scene and reflects the most contemporaneous evidence of what transpired. Moreover, it is what the officers reported to the court that issued the warrant." 193 F. Supp. 3d at 727. Chief Judge Jordan considered the conflict and the timeline and decided to suppress the evidence. The same is true here.

Remembering a detail years later is difficult. Detective Williams acknowledged that there were other aspects of the day that he didn't remember, such as whether the Avalon's windows were tinted. Hr'g Tr. at 53-54. He did not remember this even though he spent more time looking at the car after it was abandoned and searched than he would have observing a seatbelt violation.[9] Yet when he was called to explain the incident three years later, he remembered a left turn that is nowhere in the written narrative.

The Government advanced two cases at the hearing to oppose suppression. *See United States v. Thomas*, No. 5:20-CR-10-DCB-FKB, 2021 WL 5173618 (S.D. Miss. Nov. 5, 2021); *United States v. Moore*, No. 3:23-CR-75-HTW-ASH, (S.D. Miss. Mar. 5, 2024). Neither warrants a different conclusion. In *Thomas*, another seatbelt case, "[h]aving observed the demeanor of the witnesses and having considered their testimony, both under direct and cross-examination," Judge Bramlette determined that the Government's witnesses were more credible than the defendant who testified. 2021 WL 5173618, at *2. In addition, the officer observed the violation from three vantage points: the front windshield; the partially opened driver-side window; and after the vehicle was stopped the officer was speaking with Thomas from the driver-side of the vehicle, which

---

[9] Common sense suggests whether he observed the seat belt violation as McElroy was turning onto Medgar Evers or traveling north on Medgar Evers, that observation would have taken only mere seconds. The time spent at the abandoned vehicle waiting there while JFD was called and arrived, and then the search of the vehicle took much, much longer than a few seconds.

13

allowed the officer to observe directly that Thomas was not wearing his seatbelt. *Id*. at *1. In *Moore*, meanwhile, there was no conflict between the officer's report and his testimony, and Judge Wingate declined to make a credibility determination—opting to submit the issue to the jury. No. 3:23-CR-75-HTW-ASH, Docket No. 35 at 96. Different facts support different outcomes.

For the above reasons, the Court finds that the lack of reasonable suspicion for the stop rendered it unlawful under the Fourth Amendment.

### B. Fruit of the Poisonous Tree

Mr. McElroy seeks to suppress the evidence obtained from the vehicle search. Docket No. 34. "Under the fruit-of-the-poisonous tree doctrine, 'all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation.'" *Martinez*, 486 F.3d at 864 (citing *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998)).

The gun and other contraband seized from the Avalon were derived solely from the illegal *Terry* stop. It was only when Detective Williams stopped Mr. McElroy for the alleged seatbelt violation that he identified him and sought a search warrant. There was no "break in the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation." *Id.* Accordingly, the evidence obtained from the vehicle search must be suppressed under the fruit-of-the-poisonous tree doctrine. *Id.*

The Fifth Circuit has outlined three exceptions to the fruit of the poisonous tree doctrine. "Evidence will be admissible despite the exclusionary rule if: (1) it derives from an independent source, (2) it has an attenuated link to the illegally secured evidence, or (3) it inevitably would have been discovered during police investigation without the aid of the illegally obtained

evidence." *United States v. Runyan*, 275 F.3d 449, 466 (5th Cir. 2001) (quotations and citation omitted).

The Government does not raise any plain view, automobile, or protective sweep exceptions that might otherwise justify the search of the Avalon and seizure of the gun. And nothing in the facts demonstrates that any would apply. A warrant was granted to enter the vehicle, but the warrant was procured using testimony that was not credible. Detective Williams would not have smelled marijuana from the car absent the unconstitutional stop for the claimed seatbelt violation. As such, the Court finds that no exception is applicable in this case.

## IV.  CONCLUSION

Mr. McElroy's *Motion to Suppress Evidence* is **GRANTED.**

**SO ORDERED**, this the 5th day of July, 2024.

s/ Carlton W. Reeves  
UNITED STATES DISTRICT JUDGE